[No. 3193.]

David Treadwell v. The State.

Homicide—Evidence—Fact Case.—Homicide is the destruction of the life of one human being by the act, agency, procurement or culpable omission of another. See the statement of the case for evidence *held* insufficient to establish a homicide, and hence insufficient to support a conviction for murder in the second degree.

Appeal from the District Court of Henderson. Tried below before the Hon. F. J. McCord.

The indictment in this case was filed on the fifth day of October, 1881. It charged the appellant with the murder of one G. R. Honeycut, in Henderson county, on the twenty-fourth day of November, 1875. The conviction was for murder in the second degree, and the punishment awarded was a term of five years in the penitentiary.

W. E. Honeycut was the first witness for the State. He testified that he was the father of the deceased, G. R. Honeycut. The deceased lived near the town of Goshen, in Henderson county, at the time of his death, and had a wife and two children. The deceased was shot just below his navel, on the twenty-fourth day of November, 1881 (?), and died the following September. Witness was not present at the time of the shooting, and did not hear of it until between nine and ten o'clock at night after it occurred. From the time he was wounded, until his death, the witness was with him constantly, except the short time he was with Doctor Cook in Athens, and about two weeks while he was under the treatment of a doctor in Kaufman county. The deceased never recovered from the effects of the wound; he never got sufficiently well to move or ride around generally. He rode to Doctor Gardner's place, a mile and a half or two miles distant, a time or two. He was taken to Doctor Cook in Athens, and from Athens home in a wagon, neighbors assisting witness to put him in the wagon. A thin skin would sometimes form over the wound, but on being pressed the wound would discharge. It was in May after he was shot in November that the deceased was taken to Doctor Cook in Athens. Deceased never performed any labor

after he was wounded. After the deceased was taken home from Doctor Cook's he lay in bed constantly, except perhaps a time or two, when he rode to the house of Doctor Gardner. On such occasions the witness helped him get on his horse. At the time of his death, and for some time before, the deceased was badly swelled about the privates, and about the wound. Doctor Gardner was the last doctor to attend the deceased. Doctor Rooks, now a resident of Smith or Cherokee county, was the first doctor to attend him. The deceased had a bloody action of the bowels a few days after he was shot. He remained at his own house for about one month after he was shot. He was removed to the witness's house by the witness on Christmas eve day.

Cross-examined, the witness stated that he had never seen or heard of Doctor Rooks since he attended the deceased. The deceased stayed with a physician in Kaufman county about two weeks, returned home, and was sent by the witness to Doctor Cook in Athens, where he stayed for two, three, or perhaps four weeks, and was taken home by the witness. When shot, the deceased lived about six miles from the house of the witness. Witness attended him there about a month, and then took him to his, witness's, house. If Doctor Johnson ever attended the deceased the witness did not know it. The deceased was not able to be up while in Goshen. It was about a week after he returned from Doctor Cook's before he rode over to see Doctor Gardner. The bloody action of the bowels spoken of occurred within two weeks after the wound was inflicted. He had other actions of the same character after he was moved to the witness's house. The deceased never had any disease other than the wound spoken of. The wound formed a running sore about the size of a dollar, and was a running sore until the deceased died. The parts about the abdomen and privates were swelled. Witness first observed this swelling after he took the deceased to Doctor Cook. Witness could remember but one visit the deceased made to Doctor Gardner, which was the only time Doctor Gardner treated him, though he may have sent medicine. Deceased had no doctor after witness took him to his, witness's, house, until he was taken to Doctor Cook in Athens, except the Kaufman county doctor. Deceased was never free of pain after he was shot; he was not diseased, and never had the dropsy or other disease before he was wounded.

William Melton was the next witness for the State. The sub-

stance of his testimony was that he knew the deceased well in life. Before he was wounded he was in good health, and would weigh perhaps one hundred and forty-five pounds. He was of little or no account after he was shot, though he got so he could go around a little. He always afterwards complained of pain. He never performed any labor after he was wounded. The witness saw him in bed a few days before his death. He was then much swollen or bloated.

Cross-examined, the witness said that the deceased was shot during the month of November, 1875, and died in September, 1876. The witness saw the deceased walking around the house a day or two before he went to Kaufman county. If deceased was a diseased man before he was shot, the witness did not know it. The witness attended the deceased as a nurse only, while he lay at his own house, and then only at night. He knew of no doctor having attended the deceased before he was moved to his father's house. The deceased appeared to be very much swelled after he came back from Athens, where he went to see Doctor Cook. Witness did not know the cause of the swelling. Witness examined the wound only the one time, just after it was inflicted. He did not nurse the deceased after he was taken to his father's house. He did not think that the deceased was sat up with much after that. Deceased could walk about a little after being taken to his father's house, but was ever afterward helpless. He complained of his wound, saying that he was easy only when under the influence of medicines.

W. H. Griffith testified, for the State, that he had known the defendant Treadwell for the last ten or twelve years. He knew the deceased for some seven or eight years before his death. The witness could not remember the year in which the shooting of the deceased occurred, but it was some eight or nine years before this trial. The shooting occurred in a dispute which arose over an effort to get up a pony race. The deceased was drinking, and was very talkative. He proposed to bet on a certain horse, and the defendant asked him what he wanted to wager. He said that he would bet a quart of whisky. Some words and a little fight ensued. The defendant struck the deceased several times, and the deceased made some little defense. They were presently separated by the bystanders. When the defendant was released, he walked to a point behind a neighboring house, where he remained about a minute. The deceased was released about this time. He said that he was not angry, and wanted

to talk to defendant. Defendant and deceased met each other presently in the presence of the witness. The deceased was waving his hands, and said: "Dave, by G—d, I did not mean to insult you." Defendant told deceased to keep his hands out of his face. Deceased paid no attention to this, and about this time witness heard the report of a pistol, and deceased fell, calling for some one to help him. Defendant remarked: "Now you will keep your G—d d—d nands out of my face." When the pistol fired, the defendant was standing to the left of the witness. In a few minutes the witness saw some one going off. Witness thought that the defendant owned one of the ponies, but was not a party to the bet.

Cross-examined, the witness said that the difficulty occurred in the town of Goshen, near the corner of Jones's store. Witness was within two steps of the parties. Deceased had a good deal to say about the race. When the defendant asked him what he proposed to bet, he replied, in a daring manner, gesticulating with his nands in defendant's face: "By G—d, sir, a quart of whisky" The defendant appeared somewhat insulted by the bet offered, and replied. 'I don't make such bets." The deceased may nave said that he was as big and as good a man as the defendant when he offered to bet the quart of whisky. The defendant either pushed the deceased with his open hand or struck nim, knocking nim back six or seven steps. The deceased went back to defendant, when the latter struck him three or four blows before they were separated. Witness saw the deceased with an open knife in his hand after the parties were separated. Either witness or another man took the knife away from deceased. The defendant was hair the width of the court room distant from the deceased when the latter was released. In the effort to separate the parties, the witness first caught the defendant, who told witness to release him; that he had no intention of harming the deceased. He then, on being released, went from, and not toward the deceased. On defendant's return from behind the house, they met, and in a minute or two the shooting occurred. Deceased had nothing in his hands at that time. He was swearing and making threats when the defendant went to the rear of Jones's store. The defendant was standing still when the pistol fired, and was telling the deceased to keep his hands out of his face. When shot, the deceased was apologizing in a drunken manner.

J. N. Pollard was the next witness for the State. He testified

that the deceased was shot in November or December, 1875. Witness knew the defendant by sight. At the time of the difficulty which terminated in the shooting, Webb Berry and John Miller were making a horse race, on which the deceased proposed to bet a quart of whisky with the defendant. The defendant replied: "Do you think I would belittle myself betting a quart of whiksy on a horse race?" The deceased, under the influence of drink, was making some gestures at the defendant, and the defendant knocked and kicked him up against a wagon wheel. The deceased ran his hand in his pocket, and defendant called to him: "Pull it out; I am good at that too." Defendant then went to the rear of the house, and returned in a few minutes. Deceased met him, apologized in a drunken manner, waving his hands, and defendant fired, drawing his pistol from his hip pocket. Two courts prior to this trial, the witness had a conversation with the defendant. The defendant, taking witness aside, asked him if he was a witness in this case. Witness replying that he was, defendant told him how the shooting occurred. Witness replied to him· "I did not see it that way." The deceased had nothing in his hands when he was shot, and was making no effort to fight.

Cross-examined, the witness stated that the first dispute arose near the southwest corner of the store, and the other, in which the shot was fired, near the northwest corner. The witness thought the defendant choked the deceased a little before he struck him. Defendant did not crowd the deceased. Deceased was cursing when defendant went behind the store, but was using no threatening language. Two men took the defendant behind the house. Defendant, on his return, walked up to where the deceased and Griffith and others were standing and said: "I will show you how to insult a gentleman." The pistol he used was a small weapon. He carried it in his hand to his horse. He fired at the deceased from about six feet range, his pistol hand a little extended. He fired as soon as he drew. He made no effort to shoot. No one caught defendant when he drew his pistol. The deceased did not pull a knife from his pocket during the fight. Witness did not see Griffiith or any one else take a knife from deceased. The defendant took no stock in the horse race. Witness had never seen him, defendant, take a drink. Witness knew nothing of a dog fight occurring at the time or place of the shooting. When deceased fell, the defendant walked up to him, cursed, and said: "You will learn now how

to insult a gentleman." He then mounted his horse and rode off at a rapid gait. The State closed.

Felix Adams was the first witness introduced by the defense. He testified that he now lived near the town of Goshen, and lived in the town at the time of the difficulty in which the deceased was shot by the defendant. Some of the boys were trying to arrange a horse race. The deceased proposed to bet the defendant a quart of whisky on the race. The defendant declined, saying: "Do you suppose I would belittle myself by betting a quart of whisky on a horse race? I will bet a bunch of ponies." The deceased then ran up close to defendant, waving his hands in defendant's face. The defendant pushed him off, and told him to stay off. The deceased ran at the defendant again, and defendant struck him four or five times. Thereupon the deceased drew his knife. Defendant's brother then caught and started off with the defendant. The deceased called to him: "Don't run off; stand your ground. Come back and fight it out, but don't be a coward." The deceased was then following the defendant. The shooting took place some thirty or forty feet from where the difficulty began. Some dogs fighting attracted the attention of the witness, and he did not see the shot fired, but heard it and saw the smoke.

Cross-examined, the witness stated that, in the first difficulty, the deceased threw up his hands, evidently to ward off the defendant's blows. He backed three or four steps while the defendant was striking him. The deceased had not yet reached the wagon, or near to it, when he drew his knife. When the deceased put his hand in his pocket, the defendant placed his hand on his hip pocket, and said: "Draw it out, if you want to." The deceased, in backing at the time the pistol fired, even if he had gone far enough, would not have struck the wagon. He would have passed it by following the direction from where the shot was fired. Witness saw the defendant when he went to his horse with his pistol in his hand, after he shot the deceased. He did not stop after he fired, and there was no cursing afterward. The defendant mounted his horse, and left in a rapid lope. Witness several times met the deceased after the shooting.

On re-direct examination, the witness stated that he had never known the defendant to run a horse race. The witness had seen the deceased "knocking around" after he was shot, he, witness, thought, on foot. He knew positively that the deceased recovered enough to go about. The deceased, at the time of the first

difficulty, was in such a position that he could not strike the defendant. Witness had never seen the deceased sick, but saw him several times during the year 1875. He always looked like an unhealthy man. The defendant went to his horse direct, after he fired. He did not stoop over the deceased and curse.

Webb Berry was the next witness for the defense. He testified that he had known the defendant and the deceased about three, four or five years, at the time the shooting occurred. It occurred between one and two o'clock in the evening, in the town of Goshen. The witness and John Miller were preparing to run a horse race. The deceased went up to the defendant and proposed to bet him that the bay mare would win the race. The defendant replied that he did not bet on horse races, and that if he did, he would not belittle himself by betting a bottle of whisky. The deceased insisted that the defendant should bet with him, saying: "I am as good a man as you are, and as big a man as you are, and I will bet you a quart of whisky." Deceased got up close to the defendant and a fight ensued. When they parted, defendant went around behind Jones's store. As he started the deceased called to him: "Don't be a coward, but come back and fight it out." When the defendant came back from behind the house, the deceased approached him, and defendant told him not to come toward him. The deceased kept on his course toward the defendant. Defendant waved his hand at him, told him again not to approach, backed against Jones's store, and the pistol was then discharged. Witness did not see the pistol until after it was fired. He, however, did see the defendant push the deceased back before the pistol fired. The defendant backed at least ten or twelve steps before he shot. When the defendant came back from the rear of Jones's store, and when he was met by the deceased, he was going toward his horse. Brown and Griffith took the knife away from the deceased. The deceased's knife was open during the first difficulty. It was taken from the deceased about the time the defendant went to the rear of the store. Witness did not know whether or not the defendant saw the knife taken from the deceased. The defendant had his pistol in his hand when he went to his horse. He rode off in a lope.

George McCrary was the next witness for the defense. He testified that he was in the front of the south part of Jones's store when the difficulty between the deceased and the defendant began. He did not see the blows given and received. When

the witness first saw the difficulty, the defendant's brother had hold of him, and Griffith had hold of the deceased. The witness saw the deceased run his hand into his pocket and draw his knife, and heard the defendant say: "If that is your game, I am as good at it as you are." Defendant's brother then caught defendant, and the two went off behind the store. Deceased called out to the defendant not to be a coward, but to come back and fight it out. Griffith got the knife from the deceased about the time the defendant was taken behind the store. When the defendant came from behind the store, he started toward his horse, which was hitched some forty or fifty yards, nearly west, from Jones's house. The shooting took place about opposite the west door, or about fifteen feet from the northwest corner of the store. The deceased was drunk and staggering; the defendant sober. Witness saw the deceased once or twice after he was shot, once in the town of Goshen. This was in May, 1876. Witness did not know whether or not the defendant knew that deceased had been disarmed of the knife, nor did the witness himself know whether or not the knife was actually taken from the deceased, or whether the deceased was merely prevailed upon to put it back into his pocket. Defendant went to his horse immediately after the shooting. He said nothing to the deceased.

Cross-examined, the witness stated, in reference to seeing the deceased in Goshen after the shooting, that he did not know where he was going at the time. When the deceased ran his hand into his pocket, the defendant ran his left hand under the left lappel of his coat, and said to the deceased: "If that is your game, I am good at it too." Defendant rode off in a lope after the shooting.

John Miller was the next witness for the defense. He testified that, prior to the difficulty, he had seen the deceased but once, and the defendant but two or three times. The defendant, the witness and Doctor Johnson, returning from a camp hunt on Cedar creek, got into the town of Goshen some time during the evening of the day on which the difficulty occurred. On the way to town the defendant had proposed to the witness to trade pistols. Witness let the defendant have his pistol, and was to get the defendant's pistol from Frank Peppin, and the exchange was to be considered permanent if the defendant's pistol suited the witness. With this understanding, the defendant kept witness's pistol, and some time afterward witness got the defend-

ant's pistol. This trade occurred several miles distant from Goshen.

At Goshen, witness and Webb Berry made arrangements to run a horse race. The deceased, who was drinking somewhat, proposed to the defendant that they make a bet on the result of the race. The defendant declined, saying that he never bet on horse races, and never drank. A little fight between the defendant and the deceased was the result. After the fight, the defendant went behind Jones's store, and some parties took the deceased off down the road, east. When these parties turned the deceased loose, he came back, saying that the defendant was a coward. He called to defendant, and told him not to leave the ground, but to come back and fight. The witness did not see the pistol fire, as the weapon was hidden from his view by the corner of the house. He saw the deceased when he eased back and sat down. Immediately after the pistol fired, the defendant, without saying a word or uttering an oath, went to his horse. The pistol was a five shooter, loaded all round.

Cross-examined, the witness said that he, defendant, and Doctor Johnson spent but one night on the camp hunt. Defendant and witness got to talking about trading pistols on their way to Goshen, and several miles from town the witness himself put his pistol into the defendant's pocket. He did not remember which pocket. The witness saw the defendant but once after the diffi culty, and that was on the evening of the same day, at the house of his, the witness's, father. Witness was a stranger in the county, on his first visit to his father's family in Goshen. Witness was surprised to see the defendant get into the difficulty, as he appeared to be a quiet, peaceable man. The deceased sank down within five or six feet of the store door. Two minutes only transpired between the two difficulties.

Thomas Treadwell, the brother of the defendant, was the next witness examined in his behalf. He testified that the difficulty which culminated in the shooting of the deceased arose in a dispute about a horse race. The deceased proposed to bet the defendant a quart of whisky on the result of the race. The defendant declined, saying that he would not bet on a horse race, and that, if he did, he would not bet so small a thing as a bottle of whisky. The deceased then retorted that he was as good a man and as much of a man as the defendant, and that he would bet a quart of whisky with him on the race. Deceased then ran up to defendant and shook his fist in his face. Defendant pushed

him back.   Deceased rushed back again, shaking his fist in defendant's face, when the defendant struck him and knocked him back.   The deceased then drew his knife, struck at defendant with it and missed him.   Some parties then caught the deceased, and the defendant went off around the house.

Deceased, being released about the time that the defendant started around the house, called to defendant to come back, stand his ground and fight it out like a man.   In a short time the defendant came from behind the house, and started towards his horse.   The deceased met him and made at him again.   The defendant backed, and the deceased followed him, with his right hand on his hip pocket, and knocked defendant's hat off in an effort to strike him, and about this time the defendant fired.   The defendant said nothing after he shot the deceased, but walked direct to his horse.

Webb Berry, being re-introduced by the defense, testified that at the time of the shooting he was well acquainted with the defendant's reputation as a peaceful and law abiding citizen.   It was perfectly good.

Doctor A. A. Johnson testified, for the defense, that he was at the time of the shooting, and had been ever since, a practicing physician, residing in the town of Goshen.   He was in his house in that town at the time of the difficulty between the defendant and the deceased, and heard the report of the pistol at the time the deceased was shot.   He saw the deceased a few hours after he was wounded, and attended him in a professional capacity until he was moved away, covering a period of several weeks. Doctor Rooks was associated with the witness in attending the deceased.   They examined the wound and found it a little to the right side and just below the navel.   The ball penetrated to the cavity of the stomach, bore down to the right, and lodged near or about the right hip joint on the back side.   Witness and Doctor Rooks probed the wound.   The witness did not think that any of the internal organs were injured.   The urinary organs and the intestines, the witness thought, escaped.   The shooting occurred on or about November 24, 1875.   The wound was not necessarily a fatal one.   At most it would have produced lameness, and nothing more.   During his attendance upon the deceased, the witness watched the deceased's urine, and at no time detected indications that the urinary organs were involved.   During the summer before he was shot, the deceased had a severe attack of fever, attended with convulsions, or fits.   This sickness lasted

about a week, during which time the witness waited on him. Had the ball, when he was shot, passed through the bowels of the deceased, his death within thirty-six or forty-eight hours would have been the inevitable result. If the bowels or other internal organs had been injured, the witness and Doctor Rooks would most certainly have discovered it within the three or four weeks that they attended the deceased. Such a wound as the one inflicted upon the deceased would not, in the opinion of the witness, produce dropsy. The defendant had a good reputation for peace in the community in which he lived.

Cross-examined, the witness stated that the defendant was a friend of his. He did not see the defendant after the difficulty. Dropsy is sometimes an organic disease. When the witness left the deceased, three or four weeks after the shooting, the wound was suppurating and doing well. In the opinion of the witness, the wound in no wise contributed to the death of the deceased. Witness did not see the deceased in his last illness. Witness did not positively know that the ball entered the cavity of the stomach. The witness was asked to explain, before the jury, the effect upon the system of blood poisoning from gunshot wounds. He replied that he had never heard of blood poison. He was then asked if the wound was not suppurating when he last saw it, and if matter flowing from that wound on the inside cavity, accumulating, and being absorbed by the system, would not produce blood poisoning, general debility and finally death. The witness replied that he knew nothing about such matters. He was then asked what would be the effect of the accumulation of matter on the inside of the abdomen, which had no escape by absorption. He replied that he did not know, and declined to answer kindred questions upon the ground that he was not posted. Witness very carefully watched the progress of the Garfield case, and it was his deliberate opinion that Garfield was professionally murdered. If the deceased ever had dropsy before he was shot, the witness did not know it. Men had recovered from wounds through the bowels.

On re-direct examination the witness stated that he made no particular examination to find out whether or not the deceased had dropsy. Witness gave medicine to keep the bowels of the deceased open. Witness saw the deceased in Goshen on crutches once—in May, 1876. This was the one time he saw the deceased after he was taken to his father's house.

The substance of the testimony of Doctor R. F. Cook, the next

witness in the case, is set out in the opinion of the court at sufficient length.

Felix Adams and W. H. Griffith were separately introduced by the defense and testified that they were perfectly well acquainted with the reputation of the defendant for peace and quietude. His reputation in this respect had always been good.

Warsaw Robinson was next called by the State, in rebuttal. He testified that during the difficulty he saw the defendant go behind Jones's store and change his pistol from one pocket to the other.

The motion for new trial raised the question considered in the opinion.

*Richardson & Jones* and *Faulk & Faulk,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. On the twenty-fourth day of November, 1875, appellant Treadwell had an altercation and rencounter with one G. R. Honeycut, in which rencounter he shot said Honeycut with a pistol. On the eighth day of the following September, 1876, or nine months and a half after he was shot, Honeycut died. Appellant was indicted for the murder on the twenty-eighth day of October, 1881, nearly six years after the shooting, and over five years from the wounded man's death. At the trial appellant was found guilty of murder in the second degree, his punishment being assessed at five years' imprisonment in the penitentiary.

Though the deceased was laid up for some time, and never was entirely well after he was wounded by appellant, yet, in our opinion, the evidence, as presented in this record, not only fails to show that he died of the wound, but, if it shows anything at all with certainty as to his death, shows that death was caused by disease which was not, and perhaps could not, have been produced or occasioned by the wound. Deceased was shot in the abdomen, just below the navel. Doctor Johnson, who saw deceased just after he was shot, and who attended him several weeks after he was shot, says: "The wound was not necessarily a fatal one; at the worst it would only have produced lameness." Again he says: "I don't think the wound contributed to the death of the deceased." If left to itself, we might feel inclined to hesitate about taking Doctor Johnson's testimony, or, rather, his

opinions, as an expert as far from being conclusive, since he swears he has never heard of "blood poisoning," and that though he "watched the Garfield case very carefully, it was his opinion that he (Garfield) was professionally murdered." There is, however, other expert testimony. Doctor Cook testifies that deceased was under his treatment for about a month; that he and Doctor Parsons examined him very carefully, and pronounced his disease "pericarditis," or dropsy of the heart; that it would require direct injury to the heart to bring about "pericarditis." "Blood poison is not likely to occur in eight or ten months after a wound was inflicted. I could not tell what caused the pericarditis in this case. I and Doctor Parsons gave deceased a thorough examination, and reached no conclusion as to its cause. Doctor Parsons is a physician of very high standing; I know of no better in the State." He says deceased was brought to him for treatment six months after he received the wound. "Deceased never complained of the wound, but complained all the time of pain in the region of the heart.   *   *   *   Pericarditis is usually caused by a direct injury to the heart, and it is sometimes caused by an attack of rheumatism, and various other causes, many of which are unknown. Deceased was liable to die suddenly at any time.   *   *   *   Deceased made no complaint of the wound. I have seen an old wound break again, but I examined the wound in this case a number of times while he was with me, and on the day before he left, and it seemed perfectly healed. The pus usually forms in a very short time after a wound, and if blood poisoning should set up, it would cause death before pericarditis could be produced, if blood poisoning could cause pericarditis at all. I don't think blood poisoning could cause pericarditis.   *   *   *   If the wound arose and run after he left me, my opinion is that it and pericarditis both produced death together."

To say the least of it, this evidence leaves it extremely doubtful if the wound even contributed to the death, much less that it caused it. To sustain a charge for murder, the State must in all cases show that there was a homicide. "Homicide is the destruction of the life of one human being by the act, agency, procurement or culpable omission of another." (Penal Code, Art. 546.)

Has a homicide been proven in this case? We do not hesitate to say that it has not been proven with that degree of certainty that we would feel warranted in saying that on account of the

proof a citizen should be branded as a murderer and punished as a felon.

The court erred in refusing a new trial, and the judgment is reversed and cause remanded.

*Reversed and remanded.*

Opinion delivered June 14, 1884.